# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

HARMAN INTERNATIONAL
INDUSTRIES, INCORPORATED,

    Plaintiff,

    v.

ILLINOIS NATIONAL
INSURANCE COMPANY,
FEDERAL INSURANCE COMPANY,
and BERKLEY INSURANCE
COMPANY,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N22C-05-098
PRW CCLD

Submitted: October 23, 2024
Decided: January 3, 2025
Written Decision Withdrawn, Clarified, and Reissued: January 7, 2025

*Upon Plaintiff's Motion for Summary Judgment,*
**GRANTED.**

*Upon Defendants' Motion for Summary Judgment,*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

Jennifer C. Wasson, Esquire, and Carla M. Jones, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Robin L. Cohen, Esquire, Orrie A. Levy, Esquire (*argued*), and Maria Brinkman, Esquire, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York, *Attorneys for Plaintiff Harman International Industries, Incorporated.*

Kurt M. Heyman, Esquire (*argued*), and Aaron M. Nelson, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Alexander S. Lorenzo, Esquire, Kelsey Kingsberry, Esquire, ALSTON & BIRD LLP, New York, New York,

*Attorneys for Defendant Illinois National Insurance Company.*

Robert J. Katzenstein, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Daniel London, Esquire, LONDON FISCHER LLP, New York, New York, *Attorneys for Defendant Federal Insurance Company.*

**WALLACE, J.**

Harman International Industries, Inc. brings a breach-of-contract claim and seeks declaratory judgment against its Insurers for failing to indemnify it for a settlement in an underlying securities action. The Insurers contend that a certain exclusion applies here and bars coverage for the underlying action.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendants' Motion for Summary Judgment.

## I. THE PARTIES[1]

Plaintiff Harman is a Delaware corporation that became a subsidiary of Samsung Electronics America, Inc., in 2017. Defendants Illinois National Insurance Company ("AIG"), Federal Insurance Company ("Chubb"), and Berkley Insurance Company (collectively, with AIG and Chubb, "Insurers") were Harman's insurers at the times relevant to this dispute.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. THE D&O INSURANCE

Harman purchased Directors and Officers ("D&O") insurance from Insurers

---

[1] The Court here briefly reintroduces the parties who were more thoroughly described in an earlier opinion. *Harman Int'l Indus. Inc. v. Illinois Nat'l Ins. Co.*, 2023 WL 3055217, at *1 (Del. Super. Ct. Apr. 24, 2023) ("*Harman I*"). Following *Harman I*, Berkley was dismissed by stipulation; only AIG and Chubb remain as parties to the present motions for summary judgment.

[2] Again, for the interested reader, certain of this background was more fully laid out in the Court's earlier motion to dismiss opinion. Portions of this section are taken therefrom. *Id.* at *1-3.

that covered a term from January 29, 2016, through January 29, 2017.[3] Insurers issued a primary policy (AIG), first excess policy (Chubb), and second excess policy (Berkley), that together provided $40 million in coverage.[4] As relevant to this action, those policies all operate identically.[5]

The Policy includes an exclusion[6]—commonly known as a "Bump-Up Provision"—within the definition of "Loss," that reads:

> In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.[7]

---

[3]    Compl. ¶ 2; Compl. ¶ 23; Nelson Aff. in Supp. of Defs.' Mot. for Summ. J. ("Nelson Aff.") Ex. 9 ("AIG Policy") (D.I. 107).

[4]    Compl. ¶¶ 2, 24; AIG Policy; Levy Aff. in Supp. of Pl.'s Mot. for Summ. J. ("Levy Aff.") Ex. H ("Chubb Policy") (D.I. 105).

[5]    Compl. ¶ 25. For ease, only the AIG Policy will be cited to, and the Court will refer to the collective as "the Policy."

[6] To be clear, this provision is an exclusion. *See Viacom Inc. v. Specialty Ins. Co.*, 2023 WL 5224690, at *7 (Del. Super. Ct. Aug. 10, 2023) ("The Bump-Up Provision is an exclusion. Although the "Bump-Up Provision" is in the defined terms section, rather than in the section enumerating exclusions, it operates as an exclusion based on its exclusionary effect."); *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443 (N.Y. 2021) ("[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation. This standard may be implicated even when an insurer relies on limiting language in the definition of coverage instead of language in the exclusions section of the policy because, in some circumstances, that limiting language functions as an exclusion.") (internal citations and quotations omitted).

[7]    AIG Policy § 13 (Definitions) (highlighting added).

- 2 -

## B. THE TRANSACTION

On November 14, 2016, Harman and Samsung Electronics America, Inc., "announced they had entered into an Agreement and Plan of Merger."[8] On March 10, 2017, a subsidiary of Samsung, Silk Delaware, Inc., was created for the transaction and "merged with and into Harman" through a reverse triangular merger.[9] In the end, both companies survived with Harman "a wholly owned subsidiary of Samsung" and, with certain exceptions, "outstanding Harman stock was cancelled and converted into a right to receive . . . cash."[10]

## C. THE *BAUM* ACTION AND SETTLEMENT

On July 12, 2017, Patricia B. Baum filed an amended class action complaint against Harman and other parties alleging violations of Sections 14(a) and 20 of the Securities Exchange Act of 1934.[11] That suit alleged that "Harman issued a materially false and misleading Definitive Proxy Statement" to "secure shareholder support for the undervalued Acquisition."[12] In part, the *Baum* plaintiffs asked for

---

[8] Compl. ¶ 3; *see generally* Levy Aff. Ex. B ("Merger Agreement") (D.I. 104) (hereinafter (the "Agreement"); Nelson Aff. Ex. 1 ("Samsung Newsroom Article") (D.I. 107).

[9] Levy Aff. Ex. D ("Fact Stipulation") ¶¶ 2, 3, 6 (D.I. 104).

[10] Compl. ¶ 43; Fact Stipulation ¶ 9.

[11] This underlying suit is hereinafter referred to as "the *Baum* Action." Levy Aff. Ex. C ("*Baum* Action Am. Compl.") ¶¶ 1, 115-22, 123-30 (D.I. 104) (this is the amended complaint, the original *Baum* complaint was filed on February 15, 2017).

[12] *Baum* Action Am. Compl. ¶ 5.

"compensatory and/or rescissory damages against the [*Baum*] defendants."[13]

As part of the *Baum* plaintiffs' claims, they averred:

> As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the class were precluded both from exercising their right to seek appraisal and were induced to vote their shares and accept inadequate consideration of $112.00 per share in connection with the Acquisition. The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived Plaintiff and the Class of her right to a fully informed shareholder vote in connection therewith and the full and fair value for her Harman shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning Harman's value, which was far greater than the $112.00 per share that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, Plaintiff and the Class have suffered damage and actual economic losses (i.e., *the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition*) in an amount to be determined at trial.[14]

## D. INSURERS INVOLVEMENT IN THE *BAUM* ACTION

On July 20, 2017, AIG sent a letter to Harman acknowledging that the *Baum* Action was a securities claim covered by the Policy.[15] Accordingly, it said it would

---

[13] *Id.* at ¶ 50.

[14] *Id.* at ¶ 120 (emphasis added).

[15] Compl. ¶ 53 ("In a July 20, 2017 letter, AIG acknowledged that the Action is a **Securities Claim**, and indicated that it would reimburse Harman for its **Defense Costs**, subject to a reservation of rights with respect to coverage for a judgment or settlement of the Action based on a 'Conduct Exclusion' that only applies in the event of a final, non-appealable adjudication in the underlying action establishing liability." (bold in original)); Pl.'s First Mot. for Summ. J. Br. Ex. L (D.I. 20).

reimburse Harman for its defense costs, but it reserved its rights on indemnification if, in its view, the claim was subject to a conduct exclusion.[16]

It was not until mid-December 2021 that AIG issued another letter denying coverage for any judgment or settlement based on the Bump-Up Provision.[17] Chubb and Berkley adopted AIG's coverage position.[18]

In June 2022, the *Baum* parties entered into a stipulation of settlement for $28 million which was approved by the federal district court.[19] The parties said the settlement was to avoid costly continued litigation.[20]

## E. PROCEDURAL HISTORY

In its Complaint here, Harman alleges in Count I that the Insurers breached the Policies by wrongfully excluding the *Baum* Action settlement from coverage.[21] In Count II, Harman seeks a declaration that the *Baum* Action settlement is covered by the Policy and the Insurers are obligated to indemnify Harman for the settlement.[22] Harman also seeks attorney's fees and punitive damages.[23]

---

[16] Compl. ¶ 53; Defs.' Mot. to Dismiss Br. 6 (D.I. 14).

[17] Compl. ¶ 54; Pl.'s First Mot. for Summ. J. Br. Ex. M (D.I. 20).

[18] Compl. ¶ 55.

[19] Levy Aff. Ex. K ("Stipulation of Settlement") (D.I. 105).

[20] Stipulation of Settlement at 4.

[21] Compl. ¶¶ 67-74.

[22] *Id.* at ¶¶ 75-83.

[23] *Id.* at 22.

Previously, this Court denied both Insurers' motion to dismiss and Harman's earlier request for summary judgment because the record as-then developed didn't provide sufficient facts to make any determinations in favor of either party.[24]

Now before the Court are the parties' cross-motions for summary judgment. The Court heard argument on both motions (and their answers to some supplementary questions posed by the Court); all are now ripe for decision.[25]

## III. PARTIES' CONTENTIONS

The Parties' contentions do not vary much, if at all, from their previous dueling applications for dismissal and early summary judgment.

### A. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Harman insists that the Bump-Up exclusion does not bar coverage.[26] It says the "Insurers cannot satisfy their burden to establish that *all* of the Exclusion's elements apply here, including that (1) the *Baum* Action was clearly and unambiguously 'an acquisition of all or substantially all of an entity's assets or ownership,' (2) the *Baum* Action settlement [is] 'related only to the allegation of inadequate consideration' and (3) the *Baum* Action settlement 'represent[ed] an effective increase in consideration.'"[27]

---

[24] D.I. 50.

[25] D.I. 139; D.I. 148.

[26] *See generally* Pl.'s Mot. for Summ. J. Br.

[27] *Id.* at 15-16.

First, Harman asserts that the transaction at issue is a "merger," so it falls outside of the coverage exclusion for an "acquisition" of "all or substantially all" of the assets in an entity, or an "acquisition" of "all or substantially all the ownership interest in" an entity.[28] Essentially, since it believes that the deal was not a Policy-described acquisition but, by legal formalisms, a type of merger, the Bump-Up exclusion cannot apply.

Second, Harman claims that the *Baum* Action settlement amount is covered because it doesn't *only* result from allegations of inadequate deal consideration. Here, Harman relies on the *Baum* Action's claims of violations of Sections 14(a) and 20(a).[29] Specifically, it argues that the *Baum* Action settlement can't only reflect inadequate deal consideration because Section 14(a) claims can't be used to obtain damages for inadequate deal consideration because standing for that cause of action doesn't require that the shareholder receive the deal consideration at issue.[30]

Third, Harman maintains that the settlement in the *Baum* Action was not an increase in deal consideration.[31] In support, it highlights that *the* primary reason for settling was to avoid the costs of litigation.[32] In Harman's view, the settlement

---

[28]  *Id.* at 19.

[29]  *Id.* at 21-22.

[30]  *Id.* at 24.

[31]  *Id.* at 26-34.

[32]  *Id.* at 26-27.

couldn't be said to increase deal consideration because the Insurers cannot prove that all *Baum* Action plaintiffs received deal consideration.[33] To Harman, its own tax treatment of the settlement demonstrates that the settlement was not related to deal consideration because it took no deduction therefor.[34] Harman also highlights its denial of any wrongdoing in the settlement.[35] And Harman says that the Insurers' proposed interpretation is both contrary to public policy and belied by the fact that Harman purchased a run-off endorsement from AIG to cover the *Baum* Action.[36] Lastly, Harman reasons that because the settlement was substantially comprised of attorney's fees, it can't be considered as an increase in deal consideration.[37]

In its last-breath argument, Harman tries to assert waiver and estoppel because of the five years it took the Insurers to raise the exclusion and Harman's reliance on the Policy's probable coverage during that time.[38]

## B. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Insurers assert that the *Baum* Action settlement is not covered under the Policy because it falls under the Bump-Up exclusion.[39]

---

[33] *Id.* at 28-29.

[34] *Id.* at 29-30.

[35] *Id.* at 30-31.

[36] *Id.* at 31-32.

[37] *Id.* at 32.

[38] Pl.'s Opp. to Defs.' Mot. for Summ. J. at 33-34 (D.I. 117).

[39] *Id.* at 13. (D.I. 107).

First, Insurers insist that the deal between Harman and Samsung was an acquisition.[40] They rely on dictionary definitions and the fact that the reverse triangular merger resulted in Samsung possessing or controlling all of the ownership interest in Harman.[41] Insurers say that the Agreement was an acquisition because (1) both Harman and Samsung survived the transaction while retaining their own separate legal existence, (2) there weren't two sets of voting stockholders, and (3) parties here, and to the *Baum* Action, consistently call the transaction an "acquisition."[42]

Second, Insurers contend that the Bump-Up exclusion applies regardless of whether Harman is the acquired or acquiring entity because the provision applies to any and all "acquisition[s] of all or substantially all the ownership interest in or assets of an entity."[43] Accordingly, to Insurers, the term "entity" used in the Bump-Up provision—given that term's plain meaning—is inclusive of any "Named Entity."[44]

Third, Insurers assert that the *Baum* Action alleged inadequate consideration because the *Baum* complaint requests "the difference between the price Harman

---

[40]   *Id.* at 14-24.

[41]   *Id.* at 15-16.

[42]   *Id.* at 18-19.

[43]   *Id.* at 24-25.

[44]   *Id.* at 25.

shareholders received and Harman's true value at the time of the Acquisition."[45]

Next, Insurers say the result of the *Baum* settlement was indeed an increase in consideration for the acquisition.[46] They posit here that the settlement price was based, at least in part, upon the "fair value" of Harman stock compared to what the shareholders actually received.[47]

Lastly, Insurers disclaim Harman's waiver and estoppel arguments, saying they fail because any omission about the applicability of the Bump-Up exclusion in its early communication was inadvertent, Harman suffered no prejudice as a result, and those doctrines can't be invoked to create otherwise non-existent coverage.[48]

## IV. APPLICABLE LEGAL STANDARDS

Summary judgment is warranted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[49] To be sure, under this Court's rules "a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[50] But summary judgment won't be granted "if there is a material fact

---

[45] *Id.* at 27.

[46] *Id.* at 30.

[47] *Id.* at 30.

[48] *Id.* at 33-36.

[49] Del. Super. Ct. Civ. R. 56(c); *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021).

[50] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999).

in dispute"[51] or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[52]

The Court's "well-established standards and rules apply in full when the parties have filed cross-motions for summary judgment."[53] And since these "cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with them."[54] With all that, the questions before this Court now are questions of law not of fact, and the parties by filing cross motions for summary judgment have in effect stipulated that the issues raised by their motions are ripe for a decision on the merits.[55]

---

[51] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Ct. Jan. 31, 2019); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[52] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[53] *Radulski v. Liberty Mutual Fire Ins. Co.*, 2020 WL 8676027, at *4 n.35 (collecting cases); *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *8 (Del. Super. Ct. Jan. 23, 2023).

[54] *Sarraf 2018 Fam. Tr. v. RP Holdco, LLC*, 2022 WL 10093538, at *5 (Del. Super. Ct. Oct. 17, 2022) (cleaned up). Cross-motions for summary judgment might not act *per se* as concessions that there are no genuine factual disputes. *Id.* (quoting *United Vanguard Fund, Inc. v. TakeCard, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)). But the parties here certainly have acted as these do on the particular issues they've asked to Court to now decide. And given the Court's resolution these cross-motions, it is most important to note that Harman may have hedged at times during argument on whether genuine disputes of fact that go to specific issues now posed still exist, but Insurers never have.

[55] *Radulski*, 2020 WL 8676027, at *4 (quoting *Health Corp. v. Clarendon Nat. Ins. Co.*, 2009

- 11 -

For the pending issue before the Court—does an exclusion prevent coverage—"the interpretation of contractual language, including that of insurance policies, is a question of law."[56] The Insurers must shoulder the burden of proving the applicability of any exclusion in coverage.[57] If the exclusion is applicable and the language "is clear and unequivocal," the exclusionary clause will be construed "narrowly to give effect to the interpretation most beneficial to the insured" based on its plain meaning.[58] This is because "a Delaware court will not destroy or twist the words under the guise of construing them."[59]

But where the policy language is indeed ambiguous or conflicting, the Court looks to the "reasonable expectations" of the insured at the time when it entered into the contract just "so far as its language will permit."[60] And ambiguity exists when a

WL 2215126, at *11 (Del. Super. Ct. July 15, 2009)).

[56] *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 286 (Del. 2001). *See also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("Whether [a] contract's material terms are sufficiently defined is mostly, if not entirely, a question of law.").

[57] *Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *9 (Del. Super. Ct. Feb. 25, 2015) *Origis USA LLC v. Great Am. Ins. Co.*, 2024 WL 2078226, *4 (Del. Super. Ct. May 9, 2024).

[58] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982); *see Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043, at *9 (Del. Super. Ct. July 23, 2019), abrogated by *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 274 A.3d 1006 (Del. 2022) ("Exclusionary clauses . . . are accorded 'strict and narrow construction. . . .' [C]ourts will give effect to exclusionary language where it is found to be "specific," "clear," "plain," "conspicuous," and not contrary to public policy.'" (quoting *Med. Depot, Inc. v. RSUI Indemnity Co.*, 2016 WL 5539879, at *7 (Del. Super. Ct. Sept. 29, 2016))).

[59] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982).

[60] *Ferrellgas Pr's L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 868 (Del. 2024) (quoting *Hallowell*, 443 A.2d at 927).

disputed term "is fairly or reasonably susceptible to more than one meaning."[61]

## V. DISCUSSION

The parties agree that the underlying *Baum* Action is subject to coverage.[62] The question here is whether the settlement amount, or any part thereof, is carved out of the policies definition of "Loss."

To even get there, the Court should first take a moment to address Harman's suggestion of waiver and estoppel. It'll be short pause.

### A. NEITHER ESTOPPEL NOR WAIVER ARE AVAILABLE.

Harman's attempts to invoke waiver and estoppel are ineffective. This Court doesn't recognize coverage via estoppel.[63] Why? Because "[a]s a general rule, a party cannot invoke estoppel to create an insurance contract where none exists and it cannot operate to bring within a policy's coverage property, risks or losses which the policy's terms expressly or otherwise exclude."[64] The same principle applies to waiver.[65] But even were estoppel or waiver available, there is no record evidence

---

[61]  *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *Goggin v. Nat. Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018).

[62]  *See* Fact Stipulation at 2.

[63]  *Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 289 A.3d 1274, 1283 (Del. 2023).

[64]  *McLewin v. Hill*, 1998 WL 109840, at *8 (Del. Super. Ct. Feb. 18, 1998).

[65]  *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010), as corrected (May 10, 2010) ("Finally, HLTH's waiver and equitable estoppel arguments are inconsistent with the general principle that the doctrine may 'not . . . be invoked to bring within the coverage of an insurance policy risks, property or losses not covered by [the policy's] terms or expressly excluded therefrom.'") (quoting *National Fire Ins. Co. of Harford v. Eastern Shore Labs., Inc.*, 301 A.2d

that could support such here as a matter of law.[66]

Accordingly, waiver and estoppel aren't available to Harman to end the examination necessary here.

## B. THE BUMP-UP EXCLUSION DOES NOT APPLY; THE SETTLEMENT IS COVERED BY INSURERS' POLICIES.

As a norm, a bump-up exclusion "is construed narrowly and any ambiguity in [it] will be interpreted in favor of the insured."[67]

For this Bump-Up to exclude any settlement or portion thereof: (1) the settlement must be related to an underlying acquisition; (2) inadequate deal price must be a viable remedy that was sought for at least one claim in the *Baum* Action; and (3) the settlement, or a portion of the settlement, must represent an effective increase in consideration.[68] Beyond debate, any bump-up provision like that here

---

526, 530 (Del. Super. Ct. 1973)).

[66]   Nelson Aff. Ex. 33 ("Taigman Dep."), at 34 (D.I. 109) ("Well, I -- I think I would just refer to my prior answer, I can't tell you whether the strategy would have been different if the insurers took an action that they didn't take.") and Ex. 34 ("Diprima Dep."), at 67-68 ("Well, I don't know what you mean by litigation strategy. We were trying to win the case before 2021 and we would have done that irrespective of whatever coverage position they had.").

[67]   *Viacom Inc.*, 2023 WL 5224690, at *6.

[68]   This Court previously stated at the pleading stage that "for the Bump-Up exclusion to apply to exclude any settlement as a whole: (1) the transaction must be "an acquisition of all or substantially all of an entity's assets or ownership"; (2) the *Baum* Action settlement must be related only to the allegation of inadequate consideration; and (3) the entirety of the *Baum* Action settlement must represent an effective increase in consideration." *Harman I*, 2023 WL 3055217, at *9 (Del. Super. Ct. Apr. 24, 2023) (referencing *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *20-21 (Del. Super. Ct. Feb. 2, 2021)). Having now re-examined the relevant language and the parties' cross-motion positions set out in their papers and arguments, the Court has here refined its articulation of the conditions inciting this Bump-up exclusion's application.

will exclude a settlement, or a specific portion of it, if the settlement clearly declares that its purpose is to remedy inadequate consideration given in an acquisition.

### 1. The Samsung-Harman transaction was "an acquisition of all or substantially all of an entity's assets or ownership."

The Court already established that the term "an entity" within the provision isn't ambiguous; it includes the "Named Entity"—*i.e.*, Harman.[69] This means that an underlying transaction involving Harman could trigger the exclusion. But, for that to happen, the Court must first resolve whether the underlying transaction between Harman and Samsung was an acquisition as contemplated by the operative Policy language.[70] Via either of two distinct routes, the Court arrives to find it was.

### a. Under the Policy's plain language, the transaction was an "acquisition of all or substantially all the ownership interest in or assets of" Harman.

To reiterate, for this "Loss" to be excluded it must—among other qualifications—derive from a "Claim alleging that the price or consideration paid . . . for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of [Harman] [wa]s inadequate."[71]

---

[69] *Harman I*, 2023 WL 3055217, at *10 (Del. Super. Ct. Apr. 24, 2023) ("To read "entity" the way Harman asks the Court to now do might well mangle what seems like an otherwise clear undefined contractual term.").

[70] *See Northrop Grumman*, 2021 WL 347015, at *21 (reasoning that "the Exclusion applies solely to a special type of transaction: an acquisition of all or substantially all of an entity's assets or ownership").

[71] AIG Policy § 13 (definition of "Claim" and "Loss").

"[A]ll or substantially all" means "essentially everything."[72]  Perhaps one might be tempted to simply say, as Harman does, that "acquisition of all or substantially all . . . assets of" can mean only a transfer via sale of assets as provided for by Delaware statutory law.[73]  And arguably that's not what happened here between Harman and Samsung.  But an acquisition of all or substantially all the ownership interest did—the underlying deal between Harman and Samsung was a reverse triangular merger for 100% ownership of Harman.

For the purposes of the insuring (and excluding) language here, a reverse triangular merger is—in its plainest terms—an acquisition that is effectuated, in part, via a merger mechanism.[74]  An "acquisition" in the corporate transactions context is defined as a "takeover of one corporation by another if both parties retain their legal existence after the transaction."[75]  While, a merger is "the absorption of one

---

[72]  *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 377 (Del. Ch. 2004).

[73]  *See* Dec. 13, 2024 Hrg. Trans. at 13 (D.I. 149) (alluding to DGCL Chapter 1's subchapter X).

[74]  *See, e.g.*, Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations and Business Organizations § 9.8 (2013) ( "The advantage of this type of merger is that T will become a wholly-owned subsidiary of A without any change in its *corporate* existence. Thus, the rights and obligations of T, the acquired corporation, are not transferred, assumed or affected. For example, obtaining consents for the transfer of governmental or other licenses may not be necessary, absent a provision to the contrary in the licenses or agreement, since the licenses will continue to be held by the same continuing corporation.") (emphasis added).

[75]  *Corporate Acquisition*, BLACK'S LAW DICTIONARY 429 (12th ed. 2024); *Compare Northrop Grumman*, 2021 WL 347015, at \*21 (citing *Corporate Acquisition*, BLACK'S LAW DICTIONARY 428 (11th ed. 2019)) *with Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 67 F.4th 648, 654 (4th Cir. 2023) ("Given this plain and ordinary meaning, our limited and straightforward inquiry is whether, as a result of the executed Merger Agreement, another entity gained 'possession' or 'control' 'of all or substantially all the ownership interest in or assets of' Towers Watson.").

organization that ceases to exist into another that retains its own name and identity and acquires the assets and liabilities of the former."[76] And a reverse triangular merger is "a merger in which the acquiring corporation's subsidiary is absorbed into the target corporation, which becomes a new subsidiary of the acquiring corporation."[77]

First, Harman merged with Silk; Harman completely absorbed Silk and Silk ceased to exist independently. Then, Harman was acquired by Samsung because Harman became a 100% owned subsidiary that retained its independence as a legal entity. In sum, the transaction was an acquisition that used a merger as the means to complete Samsung's acquisition of all or substantially all the ownership interest of Harman.

Accordingly, the transaction between Harman and Samsung was an acquisition under the plain language of the provision.[78]

### b. Based on its characteristics, too, the Samsung-Harman transaction was an "acquisition."

This Court has previously articulated some factors for determining whether a

---

[76] *Corporate Merger*, BLACK'S LAW DICTIONARY 429, 1181 (12th ed. 2024).

[77] *Reverse Triangular Merger*, BLACK'S LAW DICTIONARY 1182 (12th ed. 2024).

[78] *See Towers Watson*, 67 F.4th at 654-57 (given the "plain and ordinary meaning[s]" of the relevant terms a reverse triangular merger that resulted in the insured becoming a wholly-owned subsidiary was an "acquisition" within meaning of bump-up exclusion).

given transaction is an "acquisition" in this context.[79] These include: (1) whether the target retained a separate legal existence after the transaction; (2) whether the stockholders of the target and the acquirer voted; and (3) how the underlying allegations refer to the transaction.[80] Generally, an acquisition requires a vote by only the target company's stockholders,[81] resulting in the target's stockholders being cashed-out with no residual ownership post-agreement.[82]

By these measures, too, the transaction between Harman and Samsung was— in Policy terms—an acquisition even though labeled a "Merger Agreement."[83] First, Harman retained its own legal existence after the transaction with Samsung owning 100% of its shares.[84] Second, only Harman shareholders voted on the Agreement,

---

[79] *Northrop Grumman*, 2021 WL 347015, at *21.

[80] *See id.*

[81] *See, e.g.*, *Hollinger*, 858 A.2d at 376 (citing 8 *Del. C.* § 271).

[82] *Id.* (explaining that vote on acquisition is designed to give shareholders a say before their ownership interests are eliminated).

[83] *See generally* Merger Agreement; *see also* Fact Stipulations ¶ 3.

[84] *See* Nelson Aff. Ex. 25 ("Connor Dep."), at 70 (D.I. 108).

> Q. Both Samsung and Harman survived the transaction, correct?
>
> A. Yes.
>
> Q. As a result of the transaction, Samsung acquired all shares in Harman, correct?
>
> A. Samsung acquired the newly issued shares that -- that Harman issued at the -- I think they were 10,000.
>
> Q. So as a result of the transaction, Samsung went from owning zero percent of Harman to owning 100 percent of Harman, correct?
>
> A. Yes.

and as a result they lost all ownership.[85] Additionally, all former shares of Harman were cancelled, not acquired.[86] Of some import here, the *Baum* Action consistently references the transaction as an acquisition.[87] And no doubt Harman itself understood it to be an acquisition in some sense because in its Form 8-K it states that "Samsung completed its acquisition of [Harman] pursuant to the Merger Agreement and [Harman] became a wholly owned subsidiary of Samsung."[88]

Accordingly, the transaction effectuated by the Agreement between Harman and Samsung is an acquisition. Harman retained separate legal existence, only Harman shareholders voted, and the transaction was commonly referred to, even by Harman, as an acquisition.

So regardless of the analytical route taken, one arrives at the same point: the transaction complained-of in the *Baum* Action was for Policy purposes an

---

[85] Pl.'s Mot. for Summ. J. Br. at 6; *Baum* Action Am. Compl. ¶ 13; Fact Stipulation ¶ 7.

[86] Merger Agreement § 201; Fact Stipulation ¶ 7; *see also* Levy Aff. Ex. E ("Suko Dep."), at 25 (D.I. 105).

> Q. And then Harman's public shares -- publically-held shares were cancelled and converted into the right to receive cash. Is that right?
>
> A. Yes. That's my understanding.
>
> . . .
>
> Q. Yeah. So Harman's prior public shareholders' ownership in Harman ceased to exist as a result of the transaction?
>
> A. Yeah. In the completion of the transaction, correct.

[87] *See generally Baum* Action Am. Compl.

[88] Nelson Aff. Ex. 24 ("Harman Form 8-K"), at 2 (D.I. 108).

"acquisition." That is, it was an acquisition of all or substantially all the ownership interest in Harman and as such the *Baum* Action "Claim" warrants further exploration of the Bump-Up exclusion's applicability.

### 2. Damages for inadequate deal price were not a viable remedy requested in the *Baum* Action.

Next, the Court must determine whether "any amount of . . . [the challenged] settlement represent[s] the amount by which [the at-issue transaction] price or consideration is effectively increased."[89] But, for a settlement to represent such, the underlying "Claim" must actually allege inadequate consideration. Without a cognizable request to remedy inadequate deal price, it hardly seems possible that a settlement of the action could represent an effective increase in deal price. So, for the exclusion to apply, inadequate deal price must be a viable remedy that was sought for at least one claim in the *Baum* Action.[90]

Previously, the Court expressed that the *Baum* Action settlement must be related *only* to the allegation of inadequate consideration for the settlement to fall under the Bump-Up exclusion. This would exclude the entirety of the settlement as a covered "Loss"—the relief the Insurers sought at the pleading stage. Put another

---

[89] AIG Policy § 13 (definition of "Loss").

[90] Insurers disagree here. To them, it seems, as long as the plaintiffs in the underlying action ask for what might be deemed in anyway an increase in transaction price or consideration, the cognizability of such a remedy under the law (or really any other factor) means nothing—the exclusion applies.

way, for a full settlement amount to fall under such an exclusion, the contested "Loss" can *only* be related to (and be a remedy for) an allegation of inadequate consideration.[91] That doesn't mean that *all* allegations pled in the underlying suit must be related to inadequate consideration.

That said, in the circumstance of a settlement, to determine whether any part thereof might be deemed to represent the amount by which a transaction price or consideration is effectively increased the Court must look to whether (1) any relief sought was due to inadequate consideration and (2) that was indeed a viable cognizable remedy under the claims pled. So, at the outset, Insurers must establish the *Baum* Action plaintiffs requested a remedy for inadequate deal price for at least one claim, and that was a form of relief permitted for the claim alleged.

The *Baum* Action alleged violations of Sections 14(a) and 20(a) of the Exchange Act, along with allegations of self-dealing by Harman's CEO and that shareholders were precluded from exercising their appraisal rights.[92] The only relief sought in the *Baum* Action was "the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition;"[93] one

---

[91] *See Northrop Grumman*, 2021 WL 347015, at *20 (cleaned up) ("The Exclusion pushes out Loss only that represents an effective increase of the claimant's inadequate consideration; no other Loss will do.").

[92] *Baum* Action Am. Compl. ¶¶ 1, 5, 102, 108, 120. These Exchange Act claims relate to Harman's "dissemination of [a] false and misleading proxy statement." *Baum* Action Am. Compl. ¶ 1.

[93] *Baum* Action Am. Compl. ¶ 120.

- 21 -

might rightly read that as a request of relief for inadequate consideration. It doesn't make it a right or viable remedy, though. And when trying to determine what "any amount of any . . . settlement [thereof] represent[s]," that's a meaningful informant.

A cured inadequate deal price isn't the remedy for Section 14(a) and Section 20(a) claims because by the very nature of a Section 14(a) (and Section 20) claim, plaintiffs could *not* have sought "a revised appraisal of the equity they sold . . .".[94] As only violations of Sections 14(a) and 20(a) of the Exchange Act were alleged, there is no claim pled where inconsiderate deal price is a viable remedy.[95] A plaintiff's bare request of relief for inadequate price isn't enough; the court in the underlying action must also be authorized to remedy the inadequate deal price under the claims raised. Here, there is substantial doubt that in the end the *Baum* court was. So, how could the settlement amount now be deemed to be comprised in any part of a sum reflecting an increase in deal price or consideration?

---

[94] *Northrop Grumman*, 2021 WL 347015, at *20; *see Mack v. Resolute Energy Corp.*, 2020 WL 1286175, at *11 (D. Del. Mar. 18, 2020) ("In the context of the federal securities statutes at issue in this case, a plaintiff cannot say that the merger consideration should have been greater than it was, and that shortfall is the measure of the harm, because to do so then would mean that it was not the material omission that caused the harm, but that the failure of [Defendant] to negotiate a better deal was the cause of the harm.").

[95] Insurers claim that the federal court in the *Baum* Action concluded that "inadequate consideration *was* sufficient to give rise to liability." Defs.' Ans. Br. in Opp. to Pl.'s Mot. for Summ. J. 24 (emphasis in original) (D.I. 118). Not exactly. What the *Baum* court actually found was that loss causation was adequately alleged because "[t]he lower price paid to shareholders, plaintiff alleges, is a result of material omissions or false statements that justified the production of a weaker set of projections." *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 92 (D. Conn. 2019). To Insurers, this nuance seems of no moment. To the Court though, it informs just why its conclusion here isn't at odds with the *Baum* court's pleading-stage ruling.

### 3. The *Baum* Action settlement does not represent an effective increase in consideration.

What's more, for a settlement to represent an effective increase in consideration, the settlement must be for the actual purpose of "bumping up" the value of the deal.[96] In some cases, it may be possible for the Court to separate claims within a settlement agreement.[97] The Court may determine that some portions of the settlement are related to the deal price, while other portions are not—it's not an all-or-nothing analysis. But only the amount of the settlement related to curing the deal price may be excluded from coverage under the Policy language.

To determine what a settlement represents, the Court can't just look to the relief sought in the underlying action; it should look, too, to the record evidence[98] to discern the bases of the settlement. So, the Court will examine the *Baum* Action settlement here to do so and consider: (1) the language of the settlement; (2) indications that the settlement amount represents compensation for an inadequate

---

[96] *See Northrop Grumman*, 2021 WL 347015, at \*22 ("And so, if the Knurr settlement—which admitted no wrongdoing—'represent[s]' anything at all, then it represents a 'bump down'—not a 'bump up.' Accordingly, the Bump Up Exclusion doesn't apply as a matter of law.").

[97] The at-issue provision here states "Loss with respect to such Claim shall not include *any amount of any judgment or settlement* representing the amount by which such price or consideration is effectively increased." AIG Policy § 13 (definitions) (emphasis added). The Court interprets this to mean that the settlement agreement might be broken up and analyzed by claim or basis for settlement if, for instance, the settlement itself categorizes the amounts paid in such a manner.

[98] Recall, as to these cross-motion, Insurers insist there is no longer any genuine issue of material fact to be decide. To them, the Court can finally resolve whether the exclusion's applicability as a matter of law. *See, e.g.,* Dec. 13, 2024 Hrg. Trans. at 21; *see generally* Defs.' Open. Br. on Mot. for Summ. J. (D.I. 107); Defs.' Ans. Br. in Opp. to Pl.'s Mot. for Summ. J.

deal price; (3) the stage of litigation at the time of the settlement; and (4) the composition of the settlement class. While all are important characteristics of the settlement that the Court may consider, none are dispositive.

On the record developed—which the Insurers say is now adequate to resolve the issue—the Court cannot find that any part of the *Baum* Action settlement represents an amount by which the transaction price or consideration is effectively increased.

Looking first at the language of the *Baum* Action's Stipulation of Settlement, Harman expressly denies any wrongdoing and liability.[99] It states that the reason for settling "was based solely on the conclusion that further conduct of the Litigation would be protracted and expensive . . . and that it would be beneficial to avoid costs, uncertainty, and risks inherent to any litigation, especially in complex cases like this Litigation."[100] This accords with the other evidence in the record.

At the time of the settlement, the *Baum* Action was still in the early stages of litigation with only minimal discovery completed.[101] Harman estimated that defense costs for continuing the *Baum* Action would have been about $25 to $30 million.[102]

---

[99] Stipulation of Settlement 4.

[100] Stipulation of Settlement 4.

[101] The parties had participated in mediation and conducted some discovery after the Motion to Dismiss. *See* Stipulation of Settlement 3.

[102] Taigman Dep. 31

    Q. I'm sorry, let me be clearer. What did the 25 to $30 million represent?

And the Settlement Agreement was for $28 million—right in the middle of the litigation-cost estimate.[103] Avoiding the cost of further litigation is a valid reason to settle and the Court has no reason to believe this reasoning was pretextual.[104]

As well, if the parties intended for the settlement to represent compensation for an inadequate deal price, then one would expect that the settlement amount would have been in some way commensurate with the difference between the shares' acquisition price of $112 and their true value.[105] But there's been no evidence presented on the true value of the shares. And the Court shouldn't be left to speculate thereon and how it is reflected as any part of the settlement—let alone its whole— when there is ample counter evidence that the full settlement amount truly represents the actual cost of litigation had the case proceeded.

But if left to engage in such speculation, the settlement amount seems grossly inadequate as compensation for an inadequate deal price. There were 69,883,605 shares of Harman common stock.[106] The parties interpret the *Baum* complaint to

---

A. It was the estimate of the cost were we have to move forward with the case through trial, discovery – which really had not started – and potential appeal, although really focusing on discovery and trial.

[103] Stipulation of Settlement § IV.21-6.

[104] Indeed, the Court takes these representations as true. *See* Super. Ct. Civ. R. 11 (governing counsel's representations to the Court).

[105] *See Baum* Action Am. Compl. ¶ 120.

[106] *Baum* Action Am. Compl. ¶ 110.

- 25 -

allege that the true value was \$116 per share.[107] Taking this claim as true, the difference in the shares' actual value versus the deal value (\$116 compared to \$112) would be \$279,534,420, which is significantly greater than the \$28 million settlement.

One more thing. The composition of the *Baum* Action class doesn't support a finding that the settlement represents an effective increase in consideration. As already discussed, the *Baum* Action alleged violations of Sections 14(a) and 20(a) of the Exchange Act. These claims have broader allegations of wrongdoing than claims of inadequate consideration.[108] As such, the plaintiff class is broader, and any remedy offered by the settlement should be broader too.

In the *Baum* Action, the settlement class included only former Harman

---

[107] *See Baum* Action Am. Compl. ¶¶ 13, 16, 70, 82-83; Defs.' Ans. Br. in Opp. to Pl.'s Mot. for Summ. J. 6.

[108] *Compare Baum*, 408 F. Supp. 3d at 79 (internal citations omitted) ("To state a claim that a defendant has violated these provisions (collectively, Section 14(a)), a plaintiff must allege that: (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.") *and In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 289–90 (S.D.N.Y. 2010) (internal citations omitted) ("The broad remedial purpose of Rule 14a–9 is not merely to ensure by judicial means that the transaction, when judged by its real terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice.") *with LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *9 (Del. Ch. June 30, 2015), *judgment entered*, (Del. Ch. 2015) (internal citations omitted) ("In a statutory appraisal action brought pursuant to 8 *Del. C.* § 262, the Court is tasked with determining the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value.").

shareholders that held at the time of the merger vote but sold prior to receiving any deal consideration.[109] Insurers suggest that this classification means nothing because even shareholders who voted but sold before the acquisition were impacted by the inadequate consideration.[110]

But this forced interpretation is not supported by the exclusion's language which must be narrowly construed.[111] At bottom, Bump-up excludes amounts of a settlement that must "represent" the increase in deal consideration—plaintiffs alleging that they were only indirectly impacted by the inadequate consideration isn't enough.[112] To be true to the exclusion's language, any portion of a settlement amount excised from "Loss" must be limited to injury incurred at the actual time of the acquisition. Anything more would be too tenuously related to be deemed a "bump-up" in acquisition consideration.

---

[109] Levy Aff. Ex. FF ("Fowler Dep."), at 75 (D.I. 117).

> Q. Correct. And you never investigated that; right? You never asked anybody?
>
> A. No. We did not ask who the holders of record were upon the closing of the transaction that the class members who were holders as of the time of the merger to vote whether or not they still held by the time of closing. No, we didn't do that.

[110] Defs.' Reply in. Supp. of Defs.' Mot. for Summ. J. at 3-4 (D.I. 123).

[111] *See Viacom Inc.*, 2023 WL 5224690, at *6 ("the Bump-Up Provision is construed narrowly and any ambiguity in the Bump-Up provision will be interpreted in favor of the insured.").

[112] Likely, a more fitting class would be the class of plaintiffs in an appraisal lawsuit. *See, e.g.*, *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *9-15 (Del. Ch. June 30, 2015) (explaining the remedies available in an appraisal lawsuit, which is designed to vindicate fair market value of sold stock).

Accordingly, the Insurers have not carried their burden of demonstrating that any portion of the *Baum* Action settlement falls under the Bump-up exclusion.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff Harman's Motion for Summary Judgment is **GRANTED** and Defendant Insurers' Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

Paul R. Wallace